The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, thank you. You can be seated. I want to welcome everybody this morning to this session of the Fourth Circuit Court of Appeals. We are very pleased to be here and appreciate very much your hospitality. And I also appreciate the lawyers agreeing to argue in front of you. We don't do this much, to tell you the truth. We go to law schools a lot, but we rarely go to undergraduate institutions. So it was with great pleasure that I talked to your professors about our coming here to culminate the studies that you've had with regard to the Constitution and for you to have a chance to see the Constitution in action, to see an assertion in court of a person's civil rights. So with that, we'll begin. Mr. Shapiro, we'll be glad to hear from you. Good morning, Your Honors, and may it please the Court. Just as many of us have missed a church service or fasted not quite as long as we were supposed to, Mr. Carter took a Thanksgiving meal that was not consistent with the strict requirements of his faith. If we assume three meals a day in the year-long period up to and including the Thanksgiving transgression, we're talking about one meal out of 1,095. In America, it is not for the government to decide that you are not sincere about your faith and to separate you from the mandates of your God based on an isolated transgression like that. The outcome of this case is controlled by this Court's decision in Lovelace v. Lee, where the Court said that the Virginia Department of Corrections cannot make a blanket assumption that a Muslim prisoner who breaks the Ramadan fast on a single occasion is not sincere about his religion. But rather than confront the important principles of law at stake in this case, the defendants pretend that Mr. Carter's suspension from the common fair diet is not part of this case at all. The record flatly contradicts that contention. The standard, of course, for preservation is whether an argument or claim was pressed or passed upon below. And here, not only was the suspension claim passed upon by the district court, it was passed upon because Mr. Carter pressed it. And the judge ruled on it. And the judge ruled on it, exactly. In fact, at JA 158, this is in the Thanksgiving, in the district court summary judgment order, the district court summarizing the claims, and it says, Carter consumed a Thanksgiving tray from the regular menu on November 26, 2015. Staff observed him eat foods from the regular menu and per policy suspended him from common fair for one year. Carter argues that these alleged violations of his religious beliefs constitute violations of the First Amendment and RLUIPA. And then at JA 158 to 159, the district court rehearses the facts of the suspension policy, as well as the particulars of Mr. Carter's suspension pursuant to it. Well, is your challenge a facial challenge or as applied as to both the suspension policy and the common fair diet? As to the suspension policy, it's both a facial and an as applied challenge. The crux of that, as to the suspension, I mean, the crux of it is Mr. Carter was suspended. He was suspended pursuant to a policy that, you know, kicks you off of the common fair diet based on isolated transgression. So both the policy itself, as well as the operation of the policy with regard to Mr. Carter, are unconstitutional. As to the content of common fair diet, the second claim, I characterize that as an as applied challenge, saying that Mr. Carter, as an adherent of the Nation of Islam, faith is prohibited from eating certain foods, even halal foods, if, for example, they're fried. What is your specific evidence that the government knew that he was an adherent to the Nation of Islam versus the Muslim faith in general? I'm not sure that their knowledge of that is made clear in the record. It's, however, never been asserted by the Virginia Department of Corrections that that was an issue at all in this case. In other words, they didn't have knowledge that he was a Nation of Islam prisoner. Returning for a moment to the preservation issue, you know, the district court is also parsing in the exhaustion of administrative remedies section of the opinion. It's parsing the claims, and the parsing is critical here because the court says, J.A. 160, the court finds that remedies were not available for claims about his suspension, claims, plural, about his suspension, or that regular menu foods are served on a common fair menu. And then J.A. 163, I think this is the ratio decedendi paragraph that Judge Floyd was alluding to, the district court says Carter fails to establish that serving common fair foods on both the regular and common fair menus constitutes a substantial burden, and he fails to disprove the reasonableness of the suspension policy. Isn't what happened to him consistent with the deal he made with the prison? In the sense that he was put to a Hobson's choice of either consenting to an unconstitutional policy or not being on the common fair diet at all. The whole system, suspension system, the conditioning of provision of the restricted diet is an unconstitutional system. Indeed, indeed, and that's, I think that's entirely consistent and indeed controlled by the decision in Lovelace. What if the punishment were different? What if there was a punishment for violating the restrictions for the provision of the diet that didn't include taking away the meal? I think that, well, I think that would be a very different case, obviously. I mean, I'm not saying anything controversial there. Certainly that would raise very different issues in the sense that if it were a punishment that didn't relate to his religious exercise going forward or impede his religious exercise, there probably would not be the same First Amendment or RLUIPA issues that are raised in this particular case. I'll ask you another question. I'm going to switch gears on you to the question of movements. What is his situation now? Is he partaking of the common fair diet and being recorded that? Or is he eating with the general population? So I'll answer that question with regard to the genuine now now outside of the record and then answer it with regard to what's in the record. The now now is that he is not on the common fair diet. He has made requests to be reinstated to the common fair diet. On June 2nd of this year, he submitted a request form to his counselor, as well as a request form to the warden asking for reinstatement. And the warden did not respond. So he doesn't have that document because the warden has it or the secretary or et cetera. The counselor responded and said, on the form, we can't put you back on common fair. Sorry. I mean, I have that form at council table, but it's not in the record. He also made another request after the June 2nd request to the warden to which there was no response. He made another request on Thursday of last week. But the court doesn't need to go outside of the record to resolve the mootness question because here's what the record shows. The record shows that the policy says that after a yearlong period, a prisoner may request reinstatement. It doesn't say that reinstatement is mandatory, nor have the defendants presented any argument that even though the policy terms don't make it mandatory, that it is, in fact, mandatory and automatic as a matter of practice. Mootness is on the defendants. It's their burden to establish mootness. And the standard is it has to be absolutely clear that the problems that are complained of in the litigation won't recur. In your better argument, the reinstatement process is a part of the suspension policy in and of itself. It's contained in the policy. I think that it's true that the reinstatement policy essentially creates a system of hoops that he needs to jump through after a year in order to get reinstated. And there's no reason not only for him not to have been suspended in the first place, but to impose these conditions on him in order to regain a status that he should never have been removed from initially and was unlawfully removed from initially is not compliant with Reloop or the First Amendment. I may not be answering your question. I'm sorry, Judge. My point is that if the reinstatement process is part of the suspension policy, then this case is live and therefore not moot. Absolutely true. And the suspension policy is a statewide policy. It applies wherever Mr. Carter goes. So both the suspension policy with the reinstatement provision included, as well as Mr. Carter's specific suspension, follow him wherever he goes from one prison to the next. There's also not a mootness problem with regard to the defendants named because the defendants, for purposes of an injunctive claim, of course, official capacity defendants within the Virginia Department of Corrections are interchangeable. And other than the preservation argument, the defendants don't make any argument against the damages component of the suspension claim. Turning for a moment to the second claim that Mr. Carter makes about the adulteration of the common fair diet with non-Nation of Islam compliant foods, I think that some of the confusion stems from the fact that the requirements imposed upon Nation of Islam adherents are in addition to the halal requirements that are applicable to all Muslims. And so even if the defendants have carried their burden of showing that there's no genuine issue of material fact as to whether the common fair diet is halal, what they have not shown is that it is compliant with the requirements of the Nation of Islam. And the clearest example of non-compliance in the case is the serving of fried foods. At JA8 in his complaint, and note that it's a verified complaint, Mr. Carter is describing the food served and he says, quote, everything fried in violation of the NOI diet under the teaching of Honorable Elijah Muhammad. But for summary judgment purposes, he doesn't just leave it at that. He attaches affidavits from other prisoners saying the same thing. And he also attaches a writing from Elijah Muhammad that says, quote, stay away from eating fried foods. That's at JA152. But do you take that as a recommendation, as advisory, or something that they have to do? And then you also have, for example, under fruits, all fruits are good. And not necessarily that they have to place fruit on the plate every day. You know, again, recommendations and advisory. I think that stay away from eating fried foods is a pretty clear mandate. Stay away. It's not like, hey, eating fruit is a good idea. But more to the point, it's really not for the government to be parsing the specifics of essentially the equivalent of scripture and saying, Mr. Carter misunderstands his own religion. He's reading this passage that says stay away from eating fried foods as a requirement. But we've performed a different exegesis of the religious text and conclude as the government that it, in fact, is merely an advisory statement. I think the mandate here is pretty clear. And what the defendants rely on principally is a statement that they, I think, view as a concession that Mr. Carter can eat fried foods consistent with his religion. And I want to read that passage in full. It's at JA 144. I think it's impossible to read that, particularly in the context of the other evidence in the record, as an admission that he can eat fried foods. He says, common fair is not providing the proper diet on Muslim dietary trays. I'm a Muslim and is not served halal foods. Kosher foods are provided for Jewish community. It's okay for Muslims to eat kosher foods, but it not provided. No wheat bread, only on Ramadan. Juice served is not kosher or labeled kosher. No whole vegetables or fruits serving fried foods. I don't think that can be read as saying I'm permitted to eat fried foods, especially when he has said so clearly in the complaint, in the verified complaint, as well as with the support of Elijah Muhammad that he's not allowed to eat fried foods. And, of course, it's very solidly established in this circuit that a prisoner is entitled to a diet consistent with his or her religious requirements. And Lovelace, the court said, under both the free exercise clause and RELUPA in its most elemental form, a prisoner has a clearly established right to a diet consistent with his religious scruples. And just so that we have a clear picture of this, under the menu, it's not as if the prisoners are going through a buffet line, and then you have these various halal and kosher and then regular diet and common fair foods where they get to pick. They're actually handed, according to this menu, a tray of these various foods, and you're suggesting that sometimes the fried foods are on the tray, and so that's what they're served, and that's what you mean by the adulterated foods are on the tray that should not be there. So that's their only choice to eat at that time. It's not as if they're going through a buffet line, and they're to pick and choose the appropriate foods that they could eat, and they avoid the foods. They're only given the choice that's on that menu that day. That's certainly my understanding of the record, that it's not a buffet, that it's a fixed menu, and that if you can't eat something, it means you're going to be put to a choice between violating your religion or going hungry. Let me change horses on you a minute. Who has the burden to prove that the present regulation is reasonable under a Turner analysis? Under a Turner analysis, I believe that that burden is on the plaintiff. I believe it's the opposite for the RLUIPA analysis. In this case, however, the state has not come forth with any rationale whatsoever, either for the common fair diet or for the suspension policy or for Mr. Carter's specific suspension from the policy. Certainly, if there is a legitimate penological interest for First Amendment purposes or a compelling interest for RLUIPA purposes in not accommodating every single religious diet or in particular religious litmus tests, then maybe those could survive scrutiny on a fulsome record. But here, the government itself, I believe this is page 13 of their brief, say that it's a less than fulsome record as to the interests behind any of the policies or governmental actions taken here. And less than fulsome is perhaps a generous characterization because there's not even a statement as to what the interest is. Is that something you think you'll end up debating if you get to go back to the district court? I imagine it's yes. I mean, certainly that could at trial be presented as a defense, that we have a cost basis or something of that nature to justify it. It's by no means an automatic burden or an automatic requirement that's met. RLUIPA in fact states, this is at 42 U.S.C. 2000 CC-3 subsection C, this chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise. So that's a real burden that they have to overcome. If it's exorbitant, maybe it's met. Just as an observation, we've had a lot of cases from a lot of prisoners asserting a lot of different religions, asserting a lot of different needs and wants. It's never easy for a prison to accommodate everybody's individual religious beliefs. You know that as well as I do. Of course, of course. I would, with regard to this particular case, What is in the record though is that up to October of 2015, the Virginia Department of Corrections was serving a common fair diet that was compliant with Nation of Islam dietary requirements. And so certainly that undercuts, I think on any record, a claim that it was necessary to shift away from that and create a problem essentially where there was not a problem before. Certainly on this record where the government hasn't presented a countervailing interest through evidence or even by stating what the interest is, the grant of summary judgment as a matter of law was inappropriate. Again, I want to make sure I understand your position. It's basically that even though your client agreed to this process and to the consequences if he violated the rules, the whole process, whole system that's set up is unconstitutional. I mean, he was given a choice. We'll accord you your constitutional right to a particular diet if you give up your constitutional right to complain about the punishment we're going to put on you, which is a deprivation of the diet if you violate it. The whole thing is unconstitutional. The whole suspension system as punishment is unconstitutional. Yes, I do make that contention. And I also make the contention that it was unconstitutional as applied to him. In particular. Yes. Okay, thank you. All right. We have some time remaining to reply. Let's hear from Mr. McGuire. Thank you. Good morning, Your Honors, and may it please the Court. I want to thank Clemson and the Court for having us down here this morning. There are really two points or two ways I want to break the case down for the Court this morning. One is the merits issue that both the government and Mr. Carter agree is presented in this case, which is whether or not the common fair diet substantially burdened his religious exercise. And the second point that I'd like to come to second is whether or not the suspension policy has actually been challenged in this case, and if the Court thinks that it has in some capacity, what that means, in terms of whether a remand is necessary or not. And I also want to pick up on a couple of strands of the Court's questioning already. The government has not made an argument on appeal related to sort of the second part of a loop over the reasonableness standard under the First Amendment. The case was decided exclusively by the District Court and was briefed by the Department on the substantial burden question, and the Court has admonished in past cases not to raise grounds that the prisoner didn't have an opportunity to really respond to below. So we sort of just stuck with what the District Court did and just argued about the substantial burden. And with respect to that question, I think the case really just turns on the substantialness of the burden. Even if we take Mr. Carter at his word that he shouldn't eat fried foods and that he shouldn't have any of these other items, but really it's the fried foods is really the gravamen here. In large part, I think that's driven by the change at Wallens Ridge from the cold common fare menu to the hot common fare menu. That seems to be, it's not really briefed or really argued that way, but that seems to be where the fact issue is here. But if you just look at the fried foods point and you look at the menus of JA-78 to 74 to about 78, it's a few items on a menu at any given time on a tray.  that is otherwise kosher or halal compliant, does that impose a substantial burden on the inmate's religious practice? And we would submit no. Mr. Carter, in response to the Department's summary judgment motion at JA-132, says the burden on him is that he has to pick around on the tray for what he can and can't eat. It's not that he can't eat at all because it has somehow contaminated the tray, such as if they were served a tray with pork on it, for example, they couldn't touch anything on the tray. The Department would concede that that would impose a substantial burden. But here what he says is I can't eat a handful of items on a tray at a given time. And while that might impose some burden, we would submit that it's not substantial. Isn't that a question of fact? On to whether or not it's substantial, Your Honor, I think the substantialness of the burden is a question of law. We'll concede that there's some burden, but whether or not it's substantial under Lovelace, does it force him to violate his religious beliefs or otherwise change his practice? I think that's a question of law for this Court to decide. And here the facts are undisputed about what's on the tray and the facts are undisputed about what he has said his burden is in the record. But even here it doesn't appear that the District Court was answering that question because in the finding it says that Carter had not offered evidence essentially that placing the common fare foods on both the regular tray and the common fare menus constituted the substantial burden. She seemed to focus that it was okay to focus on the common fare menu, just placing it on the regular tray was okay, but not making that distinction that you had to make the common fare menu applicable. I think that's right, Your Honor, and I think it's driven from the complaint in this case and kind of the claim is very hard to ferret out what Mr. Carter's complaint actually alleged. And so I think the judge, if you read his complaint in fairness, what he really says is I don't want to have master menu food served on the common fare menu. I mean, he says that throughout. That's his central complaint and that's how he sees the case. And so that's how the District Court sort of analyzed it. And coming from the argument, I was trying to give him a better reading kind of on his complaint. Broadly speaking, his argument is the common fare menu, as I read it, wasn't meeting his dietary needs regardless of whether or not it's the master food menu being served on it or it's some other food being served on it. And so trying to give him the most liberal pro se reading possible, it doesn't come to a substantial burden because he's not forcing him to change his religious behavior. At the most, I mean, there is a commissary in the prison. He can purchase a little bit of supplemental food if necessary. So it's a burden on him, but it's not substantial. I thought under the policy he couldn't purchase anything. He can't purchase anything, Judge Floyd, that's inconsistent with the common fare requirements. For example, I think if you look in the records, you'll see he was suspended once before from the common fare menu for purchasing a ramen noodle packet that might have had some material in it that's not consistent with the common fare diet. So you can still purchase from the commissary, you just can't purchase prohibited items. So in large part, that's our answer on the first question. The question that the district court actually reached in this case is just that the burden wasn't substantial. And now on the second question about the suspension policy, I'll admit that it is difficult in some respects to separate the case from the suspension policy, but logically it's difficult to understand how he was challenging the suspension policy. As I say, if you read his complaint broadly, the case is really a challenge to the common fare program in general and the menus that are served and what the common fare food is. And if you don't think the common fare food is satisfying your religious obligations, it doesn't make a lot of sense to me to challenge the suspension from the program that's not meeting your needs. So to have a full facial challenge to I should never have been suspended from the program, to put a fine point on it, doesn't make sense if the program wasn't meeting your religious obligations. And so we just don't see the suspension policy as having ever really been the direct thrust of the challenge in this case. We recognize that we had at least one sentence in our brief below about it. The district court included that sentence pretty much exclusively in her opinion in this case. And so if the court thinks that that actually was raised, I'm sure we'll get to the mootness argument in a second, but I do think it would need to go back because the district court did not address any of the prongs of Verlupa about the suspension policy. At most, she addressed in a really cursory fashion the reasonableness prong of the First Amendment analysis. So on that sense, I do agree. If the court thinks it's there, there may be a need for some limited remand maybe on the damages component. Or maybe not. We would submit that we're going to be entitled to qualified immunity on the damages component under the First Amendment. Do you think you're going to be able to make another motion for summary judgment? Potentially. If you were sent back. If we were sent back on, like, the limited issue of damages for the suspension, because the rest of the injunctive relief is moot, I think we might move for summary judgment again on qualified immunity grounds because this has never come up before that a suspension policy like this that the offender agrees to and acknowledges these are the requirements to participate in the program hasn't been clearly established. But it may necessitate a limited remand on that question if this court doesn't want to do it in the first instance. I would note in our answer we certainly raised the defense of qualified immunity, so it's there in the record if the court wanted to touch the issue. But if the court does think the suspension policy claim is raised to some extent in the complaint, we would still suggest that the whole issue is moot, really for two reasons. One being that he's been- Before you get into mootness, there's a question about whether or not he pled that his rights were violated by his suspension. In the affidavits that were provided to the district court by your side, every one of them says that he's aware that Aaron Carter filed a lawsuit in which he claimed he was suspended because he chose to eat a Thanksgiving dinner. I mean, I don't understand how you can say you didn't understand that was a claim when all of your witnesses said it was recognized as a claim. I think, Judge Traxler, the claim came up, the whole lawsuit seems to have come up once he was suspended, which is why I say it's kind of hard to pick out what the lawsuit is really about because he didn't come forward in October when he says the menu changed, which is really what seems to be driving a lot of the lawsuit. He came forward after he was suspended. And so the affidavits that we submitted did address the suspension issue. I would submit, and mostly if you look at what they actually talked about and what documents they submitted in a procedural due process manner, he had an internal classification authority hearing. He had notice of that hearing. Here's the justification for the decision. That's from the Combs affidavit. That's the driving force behind what the department put in. As I cited in the brief, we didn't put in any of the evidence that we've put in other cases about the costs of the program or why we had the suspension agreement. None of that evidence was put in the record here, which has been developed before, so it's sort of indicative of how the department at least saw the claim. But as I say, it is certainly possible to read the suspension claim in there. There is enough in the complaint that talks about the suspension to find that type of a claim. It just doesn't make a lot of logical sense to the department when the claim is really about the food isn't satisfying my religious obligations. And if it's not satisfying your religious obligations, why would you come to federal court to complain about being suspended from that program? Because his complaint in large part was the master menu and the common fare menu are sort of bleeding together, and so they're the same thing in essence. So it's hard to figure out why it would matter to him which one he was on. But even if the court disagrees with me and thinks there is a suspension policy issue raised fairly in the complaint, it would still be moot in this case really for two reasons. The first one I want to press is because his suspension has ended. It has been over for almost nearly a year at this point. And I can agree with his counsel. He has applied for reinstatement around May 2017. I'm not aware of the one from Thursday. And I can tell the court outside the record why he was denied from being reinstated, and it was because he hasn't attended religious services recently. And now the department will acknowledge that that may be a totally different claim. Maybe you can't keep somebody off the menu for that reason, but you would still need to go through the administrative grievance process about that, grieve your failure to be reinstated or failure to really just rejoining the common fare program and signing the agreement again to participate. All right. When a person gets suspended and the suspension is up, who has the burden of taking the next step? Does the prisoner have the burden of applying for reinstatement or does the prison have the burden of starting him immediately back on the diet he was on before the suspension? No, Judge Traxler. He has the burden to apply for reinstatement. You ask your counselor to be reinstated, and I believe it goes to either the warden or the assistant warden to agree to have you reinstated to the program. How long did he go after the suspension before he requested to be put back in the program? From December to May is approximately six months, I think, five, six months he waited to apply. So the reason why he was not was different. So as I said, that may be a different lawsuit, but it's not this one. And the suspension is over. And if he's not on the common fare diet now, it's not because of the suspension that occurred here. It's because of his own actions or failure to act or problems with department's policy in another way that he would just need to regrieve and come back to court about. And then the second part, if the court doesn't agree with me on that, would be the fact that he only named exclusively officials at Wallens Ridge State Prison, and he isn't there anymore. And so although counsel is right, in some sense an official capacity suit is against the entire department. Jordan v. Sosa is a case from the Tenth Circuit where the court said, you know, yes, that's true, but if you only name individuals who are specific to a particular prison, the court really can't award any meaningful sort of relief because there's nobody to direct the judgment against. Yeah, but you can't defeat somebody's lawsuit, a prisoner's lawsuit, by moving him to different prisons. Every time he names one group, you move him over to another prison, and you've got to name another group. I agree with that, Judge Traxler. I will say there is no allegation of that here. I don't know why he was moved, but as far as I'm aware, it was not because he filed this particular lawsuit. What is he supposed to do? Does he have to amend his complaint to add different parties? Well, the way. The counterparts at the new prison where he is now? Well, sort of the suspension policy claim in general. The arbiter of the suspension policy, the person he actually needs to have in the lawsuit to change the policy if there was such a facial challenge is David Robinson, the chief corrections official for the department, who signs the policy, which is in the record. He's not going to thank you for telling him that. I see David quite often. You are representing the Virginia Department of Corrections. That's right. Well, no, Judge Floyd, I'm representing three or four specific defendants. He did not name the Virginia Department of Corrections in this lawsuit. I'm here exclusively on behalf of. Who are you employed by? The Attorney General of Virginia. And so we represent the Department of Corrections broadly, including members of the department when they're sued in their official capacities, and maybe in some cases in their individual capacities. I'm not entirely sure. But so in the large picture, just to step back to the whole case as a whole, on the claim that everybody agrees was raised here, we don't think Mr. Carter has shown a substantial burden on his religious exercise. And with respect to the suspension policy, we really just don't think it was raised the way he's pitched it on appeal at all. But if the court thinks that it has come up, a limited remand on the damages question may be appropriate for qualified immunity purposes if the court doesn't want to reach that issue. Or if the court really disagrees with me across the board, we would suggest that a remand in general is the right result here so that the record can be fully developed on the least restrictive means, whether it's narrowly tailored. Whether that comes on summary judgment or trial, I can't say. But at most, I think a remand on that issue. Unless the court has further questions. I want to follow up on the they were sued in their official capacities. That's right, Judge. As well as their individual capacities. That's right, Judge Floyd. And so being sued in the individual capacity, doesn't that mean that the VDOC was sued? No, Your Honor. There's a difference between names. There are plenty of lawsuits that come up, usually against Director Harold Clark of the whole Virginia Department of Corrections. That's who's usually named if somebody is suing about a department-wide policy. We see his name a lot. I'm sure. So it's just a little bit different when you only name specific individuals. I can read to the court from Jordan v. Sosa. I apologize, I don't have the full citation right in front of me, but this is on page 1029 from the Tenth Circuit. They say, quote, cases indicate that a transferred prisoner's challenge to system-wide prison policies is moot where he seeks equitable relief and only sues prison officials at the transferor institution. That is, the institution where he was formerly incarcerated. And so that was a federal case, which is maybe a little bit different because I think he was moved outside the state lines, but the concept is sort of the same. There's just not actually a defendant in this case who could reinstate Mr. Carter to the common fair program if the court ordered that relief. We would submit that belief isn't really present here on appeal because we'd have to go back on remand, and perhaps he could amend the complaint or adjust to fix the problem. But for purposes of right now in the case, there isn't anybody in the case who the court could say, this defendant should take this action because Director Clark isn't named here and Mr. Robinson isn't named here. So I would lean more heavily on my first argument about how his suspension is, in fact, over, and so what is harming him now, if there is anything, is his choices not to apply for a long time to be reinstated to the common fair menu or some other action of the department in not reinstating him that's different from his suspension. And I would lean more heavily on that argument than this one, but I at least wanted to make the court aware of the issue for its consideration. Does that answer your question? Yeah. Do you have any questions? Okay. Thank you, Mr. McGuire. Thank you. Mr. Ferrell, would you answer right off this question about whether or not the prisoner has sued the right defendants to get the relief he seeks? Sure. Yes, he has. Oh, that's fair. And the reason he has, first, is he's a pro se prisoner. He sued Broyles and I believe it's still our food service managers who he says were the ones who effectuated the suspension. He also sues Defendant Gregg, who is a statewide dietitian. But more to the point, he's suing all of them in their official capacity, and he is clearly seeking reinstatement to the common fair diet. And certainly any order against the defendants here would run against the Virginia Department of Corrections. And the fact that they've transferred him from one prison to the next doesn't change that. In fact, in Colvin v. Caruso, an essentially identical case in the Sixth Circuit, the prisoner was removed from a kosher diet program based on a single transgression. The Department of Corrections argued that the case was moot because he'd been moved to another prison. And the Sixth Circuit said, so what? He's still suspended. And the defendants have essentially conceded that Mr. Carter is still suspended, and that although he sought reinstatement, he was denied it. That's undisputed at this point. They rely on facts outside the record to say that, well, we had reason to keep him suspended. But that's not a mootness argument because the relief that Mr. Carter is seeking is reinstatement on the ground that he never should have been knocked off of the common fair diet in the first place. He's continuing to suffer that injury, and that injury is fully redressable through reinstatement. Can you go back to the common fair diet? Because he's suggesting that it's not a substantial burden for you, although not a buffet, to pick from the items that are on the tray that he has. There's no showing on the record either that if you skip the fried foods on the menu that you're still going to get a nutritionally adequate diet. I mean, these things tend to be designed fairly carefully to meet nutritional requirements. That's why there's a dietician who's a defendant in this case and a statewide official. So you can't just assume, I don't think, that if you start avoiding particular foods, you're still going to have enough to eat from a nutritional standpoint, nor is there any showing in the record that Mr. Carter can afford to purchase supplemental foods from the commissary. So it sounds like it's not a matter of just reinstating him to the common fair program, but requiring the common fair program to meet the Nation of Islam requirements. That's correct. He requests both of those forms of relief, and I think that also answers the question of, why would you bring a suit about being suspended if the common fair doesn't fully meet your needs? Well, it's the closest thing, first of all, that the Department of Corrections offers to his needs, and secondly, up until October of 2015 when they changed it, it was complying with the Nation of Islam requirements. Time and time again, this court has told the Virginia Department of Corrections to stop using overly restrictive religious litmus tests. Your opinion, Judge Traxler, in Morrison v. Garrity, dealt with one. Another litmus test in Wall v. Wade. Another litmus test in Lovelace v. Lee. All of these cases are Virginia Department of Corrections cases, and each time the department has come up with a different overly restrictive litmus test that essentially rejects the repeated admonitions of this court to stop playing the religious police. I see my time is up. Thank you, Your Honors. I will tell the students that one of the traditions we have on our court is that after arguments are over, we come down and greet counsel and shake hands with them. These guys are our friends. We just happen to have different jobs with regard to this particular process. So I'm going to ask the clerk of court to adjourn court, and then we'll come down and greet the counsel, and then the court will be over with. Be careful getting up, everyone. Yes, sir. Dishonorable court stands adjourned. Sign a tie. God save the United States and dishonorable court. Go ahead.
judges: William B. Traxler Jr., Henry F. Floyd, J. Michelle Childs